## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

> Plaintiff,

> vs.                                                      14-CR-3754 JAP

**BRADLEY SOZA**,

> Defendant.

### MEMORANDUM OPINION AND ORDER

On October 27, 2015, Defendant Bradley Soza filed a motion to suppress the physical evidence and statements obtained as a result of his June 29, 2014 detention and arrest. *See* DEFENDANT BRADLEY SOZA'S MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT THEREOF (Doc. No. 34). The United States opposes the motion. *See* UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS (Doc. No. 41) (Response). Having carefully considered the parties' arguments[1] and being advised as to the relevant law, the Court finds that Defendant's detention and subsequent arrest are constitutional. The Court will, therefore, deny Defendant's motion to suppress.

### Procedural History

#### I.       Defendant's Motion to Suppress

Defendant contends his June 29, 2014 detention doubly violated the Fourth Amendment. First, Defendant maintains that police arrested him without probable cause when they handcuffed

---

[1] In addition to the motion and the response, the Court read and considered DEFENDANT BRADLEY SOZA'S REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT THEREOF (Doc. No. 45), DEFENDANT BRADLEY SOZA'S SUPPLEMENTAL MEMORANDUM BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE (Doc. No. 49), and UNITED STATES' SUPPLEMENTAL BRIEF REGARDING DEFENDANT'S MOTION TO SUPPRESS (Doc. No. 52) (USA Supplemental Brief).

him at gun-point following a nearby home invasion. Second, Defendant argues that the police unlawfully intruded onto Defendant's porch to conduct the detention without obtaining a warrant and in the absence of exigent circumstances. According to Defendant, either violation requires the suppression of the evidence derived from Defendant's detention and arrest.

## II.      Hearing Testimony

On December 15, 2015, the Court held an evidentiary hearing on Defendant's motion to suppress. At this hearing, Timothy Vasquez represented the United States; Erlinda Johnson represented Defendant, who was present. During the first half of the hearing, Albuquerque Police Officer Thomas Melvin testified on behalf of the United States regarding Defendant's June 29, 2014 arrest. Officer Melvin explained that he and Officer James Demsich were investigating a break-in at a condominium complex when they detained Defendant, who was standing on the porch of a neighboring condominium. TRANSCRIPT OF DECEMBER 15, 2015 HEARING (Doc. No. 47 at 4:16-18, 5:25-6:4, 19:19, 22:2-4) (Hearing Transcript). While in the process of detaining Defendant, Officers Melvin and Demsich saw that Defendant had blood on his hands and glass on his clothes. *Id.* at 25:15-26:25. Believing they had probable cause to suspect Defendant of committing the nearby break-in, the Officers arrested Defendant, searched him, and found a loaded firearm. *Id.* at 29:10-15.

After hearing this description of the arrest, Defendant took the stand and refuted three key aspects of Officer Melvin's testimony. First, Defendant disagreed with Officer Melvin about his location at the time of the detention. Officer Melvin claimed Defendant was standing on the porch of Unit 1604 facing outwards and that the door to the Unit was closed and locked. *Id.* at 40:6-11, 41:6-10. Defendant, on the other hand, testified that he was opening the door to enter the condominium with his back to the Officers when the Officers approached him and ordered

him to stop. *Id.* at 75:16-76:6. Second, according to Officer Melvin, he and Officer Demsich approached Defendant with guns drawn in the low and ready position. *Id.* at 22:2-3. By comparison, Defendant asserted that the Officers pointed their guns directly at his head during the initial detention. *Id.* at 75:23, 76:5-6, 77:5-7. Finally, at one point during his testimony, Officer Melvin stated that he was under the impression that Defendant shared his porch with the adjacent condominium. *Id.* at 39:11-17. Officer Melvin, however, later retreated from this position and acceded that the porch where Defendant was standing appeared to be private. *Id.* at 51:22-24, 68:1-3. To dispel any remaining doubt, Defendant clarified that the porch where he was standing belonged to him alone. *Id.* at 72:19-20, 73:5-6. Aside from these areas of disagreement (or potential disagreement), Defendant otherwise verified that Officer Melvin's basic outline of events was true. *See generally id.* Additionally, Defendant provided information about his ownership and use of the porch. Defendant stated that he owned the condominium and used the porch to smoke cigarettes and to eat outside. *Id.* at 72:5-73:3.

### Factual Findings

As a general matter, the Court found Officer Melvin to be a more credible witness than Defendant Bradley Soza. With the exception of some minor confusion about the layout of the porch and the exact physical location of the suspect, Officer Melvin testified cogently and thoroughly about the events of June 29, 2014. Although Defendant's testimony was also coherent and internally consistent, Defendant was, at times, less than forthright. Most notably, on cross examination, Defendant denied that there was blood on his hands at the time of the detention. *Id.* at 83:6-19. The Court did not find this believable. Officer Melvin testified that he and Officer Demsich saw blood on Defendant's hands. *Id.* at 23:21-24:5. Photographs of Defendant from the day of the arrest corroborate Officer Melvin's testimony. Government's

Hearing Exhibits 3-4. Defendant did not object to the authenticity of these photographs and did

not provide any other explanation for how blood came to be on his hands in the photographs if

his hands were not bloodied at the time of the detention. Considering this discrepancy, the

testimony as a whole, and the demeanor of both witnesses, the Court was persuaded that Officer

Melvin was more reliable about the events surrounding the arrest. Consequently, although the

Court credits Defendant's largely undisputed testimony about his home ownership and use of his

porch, where Officer Melvin's testimony and Defendant's testimony contradict, the Court will

adopt Officer Melvin's version of events.

In accordance with this credibility determination, the Court makes the following findings

of fact under Federal Rule of Criminal Procedure 12(d).

## I.      Defendant's Home

1. As of June 29, 2014, Defendant Bradley Soza resided at and owned Unit 1604 of the

    Villas Condominium Complex, 601 Menaul NE, Albuquerque, New Mexico. Hearing

    Transcript at 72:5-11. Defendant's ownership extended to a private front porch,

    which Defendant did not share with any other condominium or condominium owner.

    *Id.* at 72:19-20, 89:4-6.

2. Defendant's Hearing Exhibit C is an accurate picture of Defendant's front porch. *Id.*

    at 72:16-18.

3. Defendant used his porch to sit with family, drink, eat meals, and smoke cigarettes.

    *Id.* at 39:7-10, 72:24-73:3.

4. Consistent with this usage, Defendant kept furniture – chairs and a small table – on

    the porch. *Id.* at 39:18-20.

5.  The Villas Condominium Complex is a gated community, *id.* at 73:73:20, which is typically very quiet without many people around, *id.* at 22:23-23:3.

## II.   Events of June 29, 2014

6.  At 12:51 p.m. on June 29, 2014, the Albuquerque Police Department received a call via 911 regarding a burglary in progress at the Villas Condominium Complex. *Id.* at 6:21-25; *see also* Government's Hearing Exhibit 7.

7.  Roughly two minutes later, Officer Melvin and Officer Demsich were dispatched to investigate the call. Hearing Transcript at 7:2-10.

8.  As they drove their cars to the scene, arrived at the scene, and began investigating the premises, Officers Melvin and Demsich received additional information from the dispatcher about the nature of the crime. Specifically, the Officers learned that (1) the women who called 911 were inside condominium 1405 when they saw a man banging on the front door, (2) this man walked around behind their condominium and gained entry by throwing a rock and breaking a sliding glass door, (3) the residents were hiding in a closet and heard the intruder say "hey" outside the bedroom door. *Id.* at 8:16-21, 9:1-3, 9:8-21, 10:13-14, 11:11-13, 31:12-16.

9.  The 911-callers described the intruder as a Spanish male, in his forties, wearing a baseball cap, a grey shirt, and pants of an unknown color. Government's Hearing Exhibit 7.

10. Officer Demsich arrived at the Villas Condominium Complex at 1:00 p.m., and after a brief miscommunication about the correct unit number, located the condominium belonging to the callers, which was housed in Building 14. Hearing Transcript at 9:3-4, 10:10-14.

11. Officer Melvin arrived at the scene of the crime at 1:03 p.m. *Id.* at 10:15-17.

12. To clear the area, Officers Demsich and Melvin walked in opposite directions around Building 14. Officer Demsich walked around the east side of the building, while Officer Melvin walked around the west side. *Id.* at 10:25-11:8.

13. As he was walking around the north corner of the building, Officer Demsich saw a man coming from Building 16 across the street. Officer Demsich told this man "to go back in," meaning to return to his home. *Id.* at 36:16-17; 37:23-38:1, 37:20-22. The man complied, turning around and walking away. The man did not run or make any furtive or suspicious movements. *Id.* at 48:6-11.

14. Officer Demsich continued on his circuit of the building and shortly thereafter (around 1:09 p.m.) crossed paths with Officer Melvin near the broken sliding glass door that had been reported by the 911-callers. *Id.* at 17:6-10, 38:7-8. Officer Demsich asked Officer Melvin whether he had seen the man coming from Building 16. Officer Melvin said "no." Officer Demsich indicated that he believed the man matched the suspect description and asked if Officer Melvin thought this man might be involved in the crime. The Officers decided to investigate. *Id.* at 13:21-14:3.

15. Officers Melvin and Demsich immediately crossed the street and approached Building 16. *Id.* at 14:2-3. While the Officers were walking through the common area of the condominium complex, they saw Defendant Bradley Soza standing on the front porch to Unit 1604. *Id.* at 19:20-24. Defendant was standing on the left side of the front porch near his front door facing outwards. *Id.* at 39:23-24, 40:6-11. The Officers noticed that Defendant fit the rough description of the suspect: he was an adult man,

who could be described as Hispanic, who was wearing a baseball cap, and a grey
sweat shirt. *Id.* at 15:24-16:3, 17:4-6, 21:18-22.

16. The Officers had not seen and did not observe anyone else in the area. *Id.* at 22:19-24.

17. Given this information, Officers Melvin and Demsich drew their firearms, held them
in a low and ready position, and ordered Defendant to put his hands on his head. *Id.* at
22:2-4. Defendant complied and the Officers walked onto the porch to handcuff
Defendant. *Id.* at 39:21-23.

18. During this period, Defendant did not make any attempt to flee. Nor did he threaten
the police in any manner. *Id.* at 48:12-17.

19. As they were handcuffing Defendant, Officers Melvin and Demsich noticed blood on
his hands and glass on his neck and clothing. Specifically, Officer Demsich observed
blood on Defendant's hands as Officer Demsich was moving Defendant's hands from
behind his head to behind his back in order to put on the handcuffs. Officer Melvin
subsequently observed glass on Defendant's person as Officer Demsich was securing
the handcuffs. *Id.* at 25:15-9, 26:21-25, 46:6-16. When Officer Melvin commented
about the glass to Officer Demsich, Defendant volunteered that he had broken the
window because he "heard something." *Id.* at 27:13-16.

20. Officer Melvin conducted a pat-down search of Defendant and found various items,
including a knife, flashlight, and syringe. *Id.* at 29:4-9.

21. After further conversation, before placing Defendant in his police car, Officer Melvin
searched Defendant a second time and discovered a loaded firearm. *Id.* at 29:12-15.

**Discussion**

**I.      Were Officers Melvin and Demsich justified in detaining Defendant?**

The first issue facing the Court is whether Officers Melvin and Demsich were justified in detaining Defendant. The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST. amend. IV. Generally speaking, to pass constitutional muster, i.e. to be considered reasonable under the Fourth Amendment, a seizure must be justified by individualized suspicion of wrongdoing. *United States v. Paetsch*, 782 F.3d 1162, 1168-1169 (10th Cir. 2015). The exact level of suspicion required, however, depends on the type of detention. To effectuate a valid investigative detention, which is a brief detention conducted for investigative purposes, a law enforcement officer need only have "reasonable suspicion" that the person committed a crime. *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007). An arrest, on the other hand, requires probable cause, which is a higher standard. *Id.* Probable cause exists only if "acts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008) (citing *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).

Like the difference between reasonable suspicion and probable cause, the difference between an investigatory detention and an arrest is a matter of degree. "An arrest is distinguished [from an investigatory stop] by the involuntary, highly intrusive nature of the encounter." *Cortez*, 478 F.3d at 1115. For instance, "the use of firearms, handcuffs, and other forceful techniques" will usually transform a police intrusion into an arrest, *id.*, unless the forceful techniques at issue were "reasonably related to the goals of the [investigative] stop." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) ("[T]he use of force such as handcuffs and firearms

8

is a far greater level of intrusion, and requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate."). Hence, to overcome the presumption that forceful techniques transform an investigative detention into an arrest, the government must show that the techniques at issue were reasonable under the circumstances presented. *Id.*

This inquiry is simple in theory, but complicated in practice. Because the reasonableness of any particular use of force depends on myriad facts, there are no bright-line rules for what constitutes reasonable force during an investigative detention. *Id.* Instead, precedent frames and guides the analysis by providing examples of what is and is not constitutional.

Relevant to this case, the Tenth Circuit Court of Appeals has regularly upheld the display of firearms and the use of handcuffs when necessary to protect officer and bystander safety. *See United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993) ("A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists."); *see also United States v. Copening*, 506 F.3d 1241, 1248 (10th Cir. 2007) (during an investigative detention, officer "may take precautionary measures that are reasonably necessary to safeguard their personal safety, and to 'maintain the status quo.'"). For example, in *Merkley*, the Court of Appeals found that it was reasonable for officers to draw their guns when approaching a suspect who they saw acting violently. *Merkley*, 988 F.2d at 1063-64. In *Copening*, the Court of Appeals concluded that an officer did not use excessive force when conducting a "felony takedown," which involved the use of firearms and handcuffs, in order to detain a suspect believed to be in possession of a loaded firearm. *Copening*, 506 F.3d at 1248-49. As this line of case law establishes, when there is a sufficiently serious threat to officer and

public safety, officers may draw their firearms and use handcuffs without converting the encounter into an arrest requiring probable cause. *United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir. 1996).

The Court agrees with the United States that Defendant's detention was reasonable under these standards. At the time of the initial detention, Officers Melvin and Demsich reasonably suspected Defendant of wrongdoing. Officer Demsich observed Defendant across the street from a home intrusion within 20 minutes of the 911 call reporting the intrusion. Defendant matched the rough description of the suspect provided by the victims. Victims described the intruder as a 40-year-old Hispanic man wearing a baseball cap and grey shirt. Defendant was an adult man, who could be described as Hispanic in appearance, wearing a grey sweatshirt and a baseball cap. Moreover, the Officers did not see any other people in the area and Officer Melvin knew the gated condominium complex to be a relatively quiet location. Taken together, these facts gave rise to reasonable suspicion that Defendant was involved in the crime. *See, e.g.*, *Lord v. Hall*, 520 F. App'x. 687, 691 (10th Cir. 2013) (finding that police officers had reasonable suspicion to initiate and continue a traffic stop where an individual was driving a white Ford truck, which was the same type of truck that was just involved in a convenience store robbery).

Armed with this suspicion, Officer Melvin and Demsich were entitled to take reasonable measures to compel Defendant to stop. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat."). They were also permitted to exercise precaution during the detention in order to ensure their personal safety. In line with these standards, given the serious nature of the crime under investigation, Officers Melvin and Demsich elected to draw their weapons and immediately handcuff Defendant upon approach. While these measures may

not have been indispensable viewed from the safety of the courthouse – Defendant apparently cooperated with the Officers' orders prior to and during the detention – they were within the realm of reasonableness required by the Fourth Amendment. The Officers were looking for a suspect who had only minutes before broken into an occupied dwelling and apparently followed the occupants when they retreated to a locked room.[2] The Officers reasonably suspected Defendant of being involved in this violent crime because he was the only person in the area and he matched the victim's general description. Under these circumstances, prohibiting police from restraining Defendant's hands and preparing themselves for a possible attack would be to "indulge in unrealistic second-guessing" regarding the necessity of the safety procedures the Officers selected. *Shareef*, 100 F.3d at 1505. Officers Melvin and Demsich reasonably responded to a potential threat of physical violence with the commonly-approved use of handcuffs and drawing of firearms. Thus, their use of forceful techniques did not transform Defendant's lawful investigative detention into an arrest unsupported by probable cause.[3]

This is not to say that Defendant's challenge to the forceful techniques, particularly to the use of firearms, is farfetched. A review of Tenth Circuit precedent suggests that drawing a weapon to stop an apparently unarmed, otherwise compliant suspect lies on the outer boundaries of acceptability when strong evidence does not tie the suspect to a violent crime or violent behavior. *See Melendez-Garcia*, 28 F.3d at 1053 (it was not reasonable for officer to use firearms and handcuffs to detain a drug suspect where officers "outnumbered the defendants, executed the

---

[2] Officer Melvin testified that the 911-callers saw the intruder throwing rocks at the clear glass door, went and hid, and then heard the intruder said "hey" outside the bedroom door. Hearing Transcript at 9:1-3, 31:12-16. Based on this information, it was reasonable for the Officers to suspect that the intruder followed the callers to the bedroom.

[3] The United States asks the Court to uphold Defendant's detention under the alternative theory that Officers Melvin and Demsich possessed probable cause to arrest Defendant from the moment they saw Defendant, even before the Officers observed any glass or blood on Defendant's person. The Court declines this request. The Court notes that upon questioning, Officer Melvin opined that probable cause did not arise until the Officers saw glass and blood on Defendant. Hearing Transcript at 66:15-67:7.

11

stop on an open highway during the day, had no tips or observations that the suspects were armed or violent, and the defendants had pulled their cars to a stop off the road and stepped out of their cars in full compliance with police orders"); *Plascencia v. Taylor*, 514 F. App'x 711, 716 (10th Cir. 2013) (unpublished) (upholding a jury verdict against an officer on the basis that the jury could have reasonably determined that the officer handcuffed the plaintiff, without possessing any objectively reasonable officer safety concern, merely because the plaintiff was a felony burglary suspect). By ruling that Officers Melvin and Demsich acted reasonably, the Court does not intend to encourage the perfunctory use of firearms when investigating burglaries and home break-ins. So while the Court finds that Officers Melvin and Demsich acted in an objectively reasonable manner given the specific characteristics of the crime at issue – the suspect had just forcibly entered an occupied condominium, followed the occupants to a bedroom, and said "hey," thereby revealing a possible desire to harm or threaten the occupants – the Court cannot wholly approve of Officer Melvin's subjective explanation for his conduct. When asked why he drew his weapon, Officer Melvin testified: "Well, this is a home invasion, a burglary, with subjects inside. There is a possibility that this subject is armed. We're not going to take any chances. That's why we approach that way." Hearing Transcript 22:15-18. Use of firearms is a serious intrusion that must be justified based on articulable facts showing that the suspect is dangerous. Here, there was no articulable reason to believe Defendant (or the burglary suspect) was armed with a firearm or other deadly weapon.[4]

---

[4] The Tenth Circuit Court of Appeals has made clear that speculation that a suspected criminal might be armed – like Officer Melvin's - does not furnish a valid basis for "the unusual intrusiveness" of drawing police weapons and handcuffing a suspect. *See Melendez-Garcia*, 28 F.3d at 1052-53 (rejecting the contention that officers could reasonably assume a drug suspect was armed because "[d]rugs and guns and violence often go together;" absent evidence tying a particular suspect to a gun, "the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs").

For this reason, the present case is distinguishable from most of the cases the United States cites to support its position that Officer Melvin and Officer Demsich reasonably drew their firearms during an investigative detention. *See United States v. Hensley,* 469 U.S. 221, 235 (1985) (officer reasonably drew firearm and pointed it in the air when conducting a car stop on robbery suspect reported to be armed and dangerous); *Paetsch*, 782 F.3d 1162, 1175 (10th Cir. 2015) (finding that it was reasonable for officers to draw their guns and use handcuffs during the car stop of an armed fleeing bank robber); *United States v. Mosley*, 743 F.3d 1317, 1330 (10th Cir. 2014) (officers' use of firearms was warranted based on furtive motions consistent with hiding or retrieving a weapon and an anonymous tip that the suspect had a firearm); *United States v. Valenzuela*, 231 F. App'x 785, 789 (10th Cir. 2007) (display of weapons was reasonable where officers were responding to a potential burglary and had been informed the subject was armed); *Shareef*, 100 F.3d at 1502, 1506 (it was reasonable for police officers to forcibly remove occupants of vehicle at gun-point because the officers received information that one of the occupants of the vehicle was wanted on a weapons violation); *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (after finding firearms at property where marijuana was being grown, officers reasonably pointed weapons at suspect who entered the property); *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir. 1982) (knowledge that arms were found at suspect's residence justified the officer's use of force).

Nor, unlike in *Merkley*, the only other pertinent case cited by the United States, did the Officers personally observe and confirm Defendant's violent and uncooperative behavior. *See Merkley*, 988 F.2d at 1063-64 (where officers were informed that the defendant had threatened to kill someone and officers saw the defendant acting violently, they were "justified in displaying firearms and using handcuffs to freeze temporarily the situation in order to ensure their safety

and that of the public.").[5] The only information justifying the use of force in this case is: (1) Defendant's proximity to a disturbing, very recent, home invasion involving a threat of physical violence and (2) Defendant's general resemblance to the intruder. No other factor demonstrates that Defendant posed a sufficient threat to the officers' or the public's safety to warrant the use of firearms. To the contrary, the detention occurred during the day, the police outnumbered Defendant, no one else was outside who might be hurt if Defendant resisted arrest, and Defendant had complied with previous officer requests to return to his home. Moreover, Defendant had not attempted to flee, he had made no threatening movements, and he had not refused to cooperate.

Thus, within the framework of Tenth Circuit law, this case fits between  the numerous cases where the Court of Appeals has upheld the display of firearms and use of handcuffs because police had a clearly "reasonable [and] articulable ground for fearing danger from [a] suspect," who was thought to be armed or who had otherwise threatened police, *United States v. Neff*, 300 F.3d 1217, 1221 (10th Cir. 2002), *see also* cases cited *supra* pp. 13,  and those cases where the Court of Appeals has admonished police for displaying firearms or using handcuffs based on generalized, inchoate beliefs that criminals are likely to possess firearms or other dangerous weapons, *e.g.*, *Melendez-Garcia*, 28 F.3d at 1052-53; *Plascencia*, 514 F. App'x at 716. In concluding that Officers Melvin and Demsich acted reasonably, the Court was guided by these cases and the Court's common sense judgment that the specific facts surrounding the crime under investigation created an articulable basis for reasonably believing Defendant might be dangerous. *See United States v. Roper*, 702 F.2d 984, 988 (11th Cir. 1983) (officer did not act

---

[5] In *Merkley*, one officer approached the defendant with the officer's left hand raised and his right hand on his firearm. The officer instructed the defendant to raise his hands and told the defendant he needed to talk to him. Rather than complying with this instruction, the defendant began walking towards the officer. As a result, the officer grabbed his hands and handcuffed him. Meanwhile, another officer on the scene approached defendant's vehicle with his weapon drawn and handcuffed the passenger. *Id.*

unreasonably in drawing his gun when approaching a vehicle with two adult males one of whom was believed to be a federal fugitive). Unlike in *Plascencia,* the crime Officers were investigating – breaking into an occupied dwelling and following the occupants to a bedroom – involved a direct threat of physical violence. Furthermore, unlike in *Plascencia,* the burglary under investigation occurred less than half an hour before Defendant's detention, so the Officers had greater reason to be concerned that Defendant, a possible suspect, might act violently. Display of weapons[6] and use of handcuffs is appropriate under these circumstances.

The only remaining area for potential dispute is whether the Officers' eventual arrest of Defendant was supported by probable cause. As Officers Melvin and Demsich were handcuffing Defendant, they observed blood on Defendant's hands and broken slivers of glass on Defendant's clothing. Officer Melvin testified that he believed these observations provided probable cause for Defendant's arrest. Defendant does not dispute this conclusion or challenge the arrest on this ground. The Court accepts this concession and will, therefore, uphold the arrest without further analysis. At each stage of the detention, Officers Melvin and Demsich acted reasonably and did not exceed the limitations posed by the Fourth Amendment given the escalating evidence against Defendant.

## II.    Were Officers Melvin and Demsich required to obtain a warrant to enter Defendant's porch?

Defendant next maintains that the Officers' unauthorized and warrantless entry onto his front porch violated the Fourth Amendment protections extended to the home. The United States

---

[6] Defendant persuasively contends that it is not reasonable for an officer to put his gun directly against the head of a suspect who only matches the general description of a home intruder and who has cooperated with the police. The Court, however, does not address this issue because it found Officer Melvin was credible when he testified that the Officers only drew their weapons into a low and ready position. This is significantly less intrusive than placing a gun against an individual's head; the threat of harm is less immediate and the potential for a deadly accident is reduced.

concedes that Defendant, as owner of the porch, has standing to challenge the police intrusion.[7]

The United States contends, however, that a warrant was not required for entry onto the porch

under the circumstances presented. While not originally framed with precision by either party,

Defendant's Fourth Amendment claim comprises two discrete elements: (1) Defendant must

show that his front porch is a constitutionally protected area and (2) Defendant must convince

the Court that the Fourth Amendment protections afforded to this area include the right to stand

on the front porch and be free from a warrantless[8] police detention. The first question is a

question of fact that is governed by well-settled doctrine. *United States v. Swepston*, 987 F.2d

1510, 1513 (10th Cir. 1993) ("the issue of what comprises curtilage is a question of fact"). The

second question, on the other hand, is primarily a question of law, whose resolution depends on a

careful reading of Fourth Amendment precedent.

### A.   The United States concedes and the Court agrees that the front porch of Defendant's condominium is constitutionally protected curtilage.

The protections of the Fourth Amendment only extend to "persons, houses, papers, and

effects." U.S. CONST. amend. IV. When interpreting this language, however, the Supreme Court

has long recognized that the area immediately surrounding the home, called the curtilage, is "part

of the home itself for Fourth Amendment purposes" and is therefore accorded constitutional

protection. *Oliver v. United States*, 466 U.S. 170, 180 (1984). Curtilage has been variously

defined as the area harboring "the intimate activity associated with the sanctity of a man's home

---

[7] In the Response, the United States called the condominium Defendant's "purported residence" and suggested that Defendant may lack standing to challenge the search. Response at 12. At the hearing, however, the United States retreated from this position. Counsel for the United States represented that standing was not a genuine issue and the United States would not be contesting Defendant's evidence of ownership. Hearing Transcript at 2:23-3:3.

[8] There are several well-recognized exceptions to the warrant requirement, including exigent circumstances. The United States, however, does not argue that exigent circumstances or any other exception justified the Officers' entry onto the porch to arrest Defendant. Thus, the issue presented to the Court is simply whether the warrant requirement extends to front porch detentions.

and the privacies of life," *id.*, or more practically as "the area immediately surrounding and associated with the home," *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). Determining the extent of the curtilage is not an exact science. Four factors guide the analysis: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). For an area to qualify as curtilage, these factors must indicate that an area is so intimately connected with the home that it should be treated as the home itself. *Id.* at 300.

Here, Defendant presented strong evidence that his front porch is constitutionally protected curtilage. The porch is attached to his home; it is recessed and visually distinguishable from the public area of the condominium complex; and it houses furniture, which Defendant uses for normal activities of daily living, such as dining. In fact, after seeing pictures of the porch, the United States conceded that Defendant's porch should be considered curtilage. Hearing Transcript at 64:17-22. The Court will accept this stipulation, which is a reasonable interpretation of the facts. The photographs and testimony indicate that Defendant's porch is more like a porch to a single family dwelling, which would typically be considered curtilage, than the common hallway of an apartment complex, which would not. *Compare Jardines*, 133 S. Ct. at 1415 (noting that the front porch to a stand-alone single family dwelling is the "classic exemplar" of curtilage) *with Harney v. City of Chicago*, 702 F.3d 916, 925 (7th Cir. 2012) (upholding warrantless arrest because plaintiff failed to produce evidence that shared walkway outside of the condominium building was curtilage) *and United States v. Barrios-Moriera*, 872 F.2d 12, 14 (2d Cir. 1989) (common hallway, even when accessed by locked door, was not within tenant's zone of privacy).

**B.   The Court concludes that the Officers' warrantless entry onto the porch was constitutional.**

Having determined that Defendant's porch is constitutionally protected curtilage, the question is not *whether* the porch is entitled to Fourth Amendment protection – it unquestionably is – the question is *how far* these protections extend. Unsurprisingly, the United States and Defendant have markedly different conceptions of how to answer this question. Defendant emphasizes the sanctity of the home, while the United States congratulates Officers Melvin and Demsich for "doing good police work" and catching a dangerous suspect. Hearing Transcript at 93:17-18. Stripped of the emotional rhetoric, the parties' dispute boils down to one simple question: Must police officers obtain a warrant to enter a suspect's front porch to effectuate an investigative detention or arrest? Although the conceptual building blocks necessary to answer this question are widely available, neither party has identified – and the Court has been unable to locate – a recent,[9] on-point case, involving the constitutionality of a warrantless front porch arrest. Instead, the parties each construct their argument by selecting those cases most favorable to their purpose. As a result, where Defendant sees a barricade protecting the front porch from non-consensual police entries, the United States sees a well-trodden path inviting officers to enter any publicly accessible area, including a front porch. For example, Defendant cites *Oliver v. United States*, 466 U.S. 170, 180 (1984) and *United States v. Dunn*, 480 U.S. 294, 301 (1987) for the proposition that curtilage is entitled to the same protections as the home, which would include protections against warrantless intrusions. By comparison, the United States cites to various older cases recognizing a reduced privacy interest in publicly visible and accessible areas of private property. Response at 14-15 (citing *United States v. Santana*, 427 U.S. 38 (1976)).

---

[9] The United States argues that the outcome of this case is controlled by *United States v. Santana*, 427 U.S. 38 (1976), a Supreme Court case upholding a warrantless front porch arrest. The Court will discuss the precedential value of this nearly forty-year-old case in more detail below.

The Court has read all of these cases, considered the parties' arguments, conducted its own research, and come to the conclusion that Defendant is correct that the Fourth Amendment generally requires police to obtain a warrant before entering curtilage to detain a suspect (unless some recognized exception, like exigent circumstances, applies). The cases the United States has identified to support the contrary conclusion are somewhat out-of-date. Nevertheless, the Court will deny Defendant's motion to suppress on narrower grounds.  Having given the matter great attention, the Court finds that it is reasonable to allow the warrantless detention of a suspect who is standing in an area of the curtilage, like the front porch, that is generally acknowledged to be open to the public. The Court believes the weight of the case law and common sense supports this as the best reading of the Fourth Amendment. Because the law in this area is still developing, however, the Court will walk through its analysis in detail.

    *i. The Warrant Requirement Extends to the Curtilage*

It is well-settled that, absent exigent circumstances, "a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable." *McInerney v. King*, 791 F.3d 1224, 1231 (10th Cir. 2015). "To enter a home and seize an individual . . . police must [generally] have . . . a warrant, no matter whether the seizure is an investigatory stop or an arrest." *Storey v. Taylor*, 696 F.3d 987, 992 (10th Cir. 2012). It has also long been established that the curtilage of a home is generally afforded the same Fourth Amendment protections as the home itself. *Oliver*, 466 U.S. at 180 (the curtilage of a home is "part of the home itself for Fourth Amendment purposes."); *Jardines*, 133 S. Ct. at 1415 ("the curtilage of the house . . . enjoys protection as part of the home itself"); *see also Lundstrom v. Romero*, 616 F.3d 1108, 1128 (10th Cir. 2010) (explaining that "[curtilage] is entitled to the same Fourth Amendment protections attaching to the home" and holding that officers violated the plaintiffs' right to be free from unreasonable

19

searches by entering curtilage without a warrant). Taken together, these principles would appear to necessitate the conclusion that police must generally obtain a warrant to briefly detain an individual who has retreated within the curtilage of his home. *United States v. Struckman*, 603 F.3d 731, 747 (9th Cir. 2010).

Not all courts, however, have adopted this conclusion. *See*, *e.g.*, *United States v. Watson*, 273 F.3d 599, 602 (5th Cir. 2001) (reasoning that while a warrantless arrest inside the home was presumptively unreasonable, warrantless arrest outside the home on the suspect's porch was permissible). As the United States emphasizes, the Supreme Court and Tenth Circuit cases equating the curtilage with the home – including *Oliver*, *Jardines*, *Lundstrom* – are all cases involving allegedly unlawful searches. In light of this fact, the United States maintains that these cases are inapposite and that Defendant's reliance on these cases "obfuscates critical distinctions drawn in the law between warrantless searches and warrantless arrests." Response at 13. According to the United States, "[w]hile the Supreme Court has extended the Fourth Amendment's protection against warrantless searches to the curtilage of a private residence, the Fourth Amendment's shield against warrantless arrest does not extend beyond the threshold of a defendant's home." *Id.* at 14. In other words, the United States concedes that the curtilage of a home must be treated as part of the home with regard to searches, but the United States maintains that curtilage should be treated as a public space with regard to detentions.

The Court does not agree that this is the best summary of the current state of the law. The Supreme Court has never carved out a viable distinction between searches and seizures that would warrant endowing curtilage with a dual character possessing full protections as to searches and no protections as to seizures. While the law regarding curtilage seizures is less developed

and less stable than the law regarding curtilage searches,[10] the Supreme Court and Tenth Circuit have not, as far as the Court is aware, ever limited or qualified their statements about the curtilage's legal status as part of the home. To the contrary, the Tenth Circuit Court of Appeals has explained that "[t]he Fourth Amendment protects the home **and its curtilage** from warrantless searches **and seizures**." *Swepston*, 987 F.2d at 1513 (emphasis added). While these statements come from search cases, the Court cannot dismiss them entirely. This is especially true because case law does not otherwise support the conclusion that there is a broadly drawn exception to the warrant requirement for all curtilage detentions.

      1. *Oliver* and *Dunn*

All of the cases extending Fourth Amendment protections to the curtilage can be traced back to *Oliver*, a 1984 Supreme Court case reaffirming the "open fields doctrine." *Oliver*, 466 U.S. 170. In *Oliver*, the Supreme Court granted certiorari in two criminal cases to resolve a split between the Sixth Circuit Court of Appeals[11] and the Maine Supreme Court[12] over whether the Fourth Amendment prohibited the police from trespassing on a field that was clearly marked as private property (*e.g.*, by fencing or no trespassing signs). *Id.* at 173-75. In reliance on a 1924 Supreme Court case, *Hester v. United States*, 265 U.S. 57 (1924), the prosecution argued that the Fourth Amendment does not shield "open fields" from police inspection. *Id.* at 174. The criminal defendants, on the other hand, argued that they had a reasonable expectation of privacy in their fields, thereby triggering the Fourth Amendment warrant requirement under the seminal case of *Katz v. United States*, 389 U.S. 347 (1967). *Id.* at 181.

---

[10] Whereas warrantless curtilage searches are presumptively unreasonable, the parties have not identified and the Court is not aware of any binding Tenth Circuit or Supreme Court case explicitly holding that the prohibition against in-home warrantless seizures extends (or does not extend) to the curtilage.
[11] *United States v. Oliver*, 686 F.2d 356 (6th Cir. 1982).
[12] *State v. Thornton*, 453 A.2d 489 (Me. 1982).

The Supreme Court in *Oliver* acknowledged that since *Katz* "the touchstone of [Fourth] Amendment analysis has been . . . whether a person has a constitutionally protected reasonable expectation of privacy." 466 U.S. at 177. Nevertheless, it rejected the defendants' position as contrary to the plain language of the Fourth Amendment, which accords special rights to the people in their "persons, houses, papers, and effects," but not in their property or fields. *Id.* at 176. That is to say, the Fourth Amendment "indicates with some precision the places and things encompassed by its protections." *Id.*; *see also id.* at 178 ("The Amendment reflects the recognition of the Framers that certain enclaves should be free from arbitrary government interference."). Because open fields do not fall on this list, they are not protected.

Writing for the majority in *Oliver*, Justice Powell took considerable pains to refute accusations by the dissenting Justices that the Court was withdrawing Fourth Amendment protections previously offered in *Katz.* As Justice Powell saw it, the open fields doctrine is "consistent with respect for reasonable expectations of privacy" because it embodies a long-recognized legal distinction between "open fields" and the "curtilage," the land immediately surrounding the home. *Id.* at 180 Justice Powell reasoned that this distinction tracked normal expectations of privacy, which adhere in the home as opposed to open areas. *Id.* In this moment of doctrinal significance, the Supreme Court recognized that Fourth Amendment protections do not stop at the four walls of the home, but extend to the curtilage. *Id.* The Court rooted this conclusion in the text of the Fourth Amendment and the common law interpretation of the word "houses." *See generally id.* Over the years, the Supreme Court has remained faithful to this interpretation. When tasked with clarifying the definition of curtilage, the Supreme Court reiterated that the "curtilage concept originated at common law" and was absorbed into the Fourth Amendment doctrine via interpretation of the word "house." *See Dunn*, 480 U.S. at 300.

Accordingly, the Supreme Court has defined curtilage as the area so closely associated with the home and privacies of life that the homeowner can reasonably expect the area to be "treated as the home itself." *Id.*

As this analysis shows, curtilage is not a separate category of constitutionally protected property that, as a matter of happenstance, enjoys similar protections as the home. At a fundamental doctrinal level, curtilage is part of the home like a basement, balcony, or attached garage is part of the home. When the Court labels a particular area as "curtilage" it is saying that this area should be treated like the other parts of the home. *Id.* at 301 (defining curtilage as "the area in question [that] is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."). Given these doctrinal underpinnings, it would seem antithetical to label certain property curtilage, yet treat the property as a public area entitled to none of the protections against warrantless detentions afforded to the home. Curtilage doctrine suggests that a back porch that is not visible from the street or accessible to the public should be treated the same as any other similarly situated part of the home (for example, an upstairs balcony). For this reason, the Court takes the Supreme Court and Tenth Circuit seriously when they announce that curtilage is part of the home and given the same protections as the home. *Oliver*, *Dunn*, and their progeny, while not definitive,[13] support Defendant's contention that the warrant requirement extends in some form to the curtilage.

### 2.   *Jardines*

The most recent Supreme Court curtilage case – *Jardines* – also supports a finding that a warrant is generally required to enter the curtilage to effectuate a detention. In *Jardines*, the Supreme Court addressed whether police officers violated a defendant's Fourth Amendment

---

[13] In *Oliver*, the Supreme Court did not express an opinion as to "the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself." *Oliver*, 466 U.S. at 180 n. 11.

rights when, without obtaining a warrant, the officers took a police dog onto the defendant's front porch to sniff for drugs. *Jardines*, 133 S. Ct. at 1413-14. The majority opinion, written by Justice Scalia, analyzed the facts under a property-based framework and concluded that the search was unconstitutional. The reasoning was quite simple: as an unlicensed physical intrusion onto the curtilage, a constitutionally protected area, the warrantless search was per se unlawful. *Id.* at 1415-16. In reaching this conclusion, the Court reminded readers that the reasonable expectation of privacy test had been "added to, not substituted for" traditional Fourth Amendment property protections. *Id.* at 1417. According to the Court, these property protections bar the police from physically intruding onto the curtilage to conduct a search unless they acquire (1) explicit or implicit permission,[14] (2) a warrant, or (3) probable cause and exigent circumstances. This is because entry onto a suspect's porch – a protected area – directly implicates Fourth Amendment property interests whether or not the entry results in an imposition on the owner's reasonable expectations of privacy.

Defendant persuasively argues that this interest is equally present when officers intrude onto constitutionally protected curtilage to conduct an investigative detention or arrest. The United States, however, would have the Court ignore *Jardines'* discussion of Fourth Amendment

---

[14] The Supreme Court distinguished *Jardines* from case law allowing officers to approach the home and knock on the door by explaining that an implicit license permits officers to approach a home and knock in the same manner as any private citizen. As the Court explained, however, the scope of this license is "limited not only to a particular area but also to a specific purpose." *Id.* at 1416. Consequently, officers could not rely on knock-and-talk case law to justify exploring the front porch with the dogs in *Jardines*.

property rights on the basis that *Jardines* does not explicitly concern a detention or arrest.[15] This

is true, but an intrusion is an intrusion and the reasoning in *Jardines* does not easily lend itself to

the introduction of a fine-grained distinction between search-related intrusions and seizure-

related intrusions. To the contrary, in *Jardines*, the Supreme Court expressed the right to be free

from unwanted physical intrusions in broad terms, declaring that "the property of every man [is]

so sacred, that no man can set his foot upon his neighbour's close without his leave." *Id.* at 1415.

Furthermore, it is telling that the only opinions this Court was able to find applying a

*Jardines*-approved property analysis to evaluate the legality of a curtilage detention have

concluded that a warrant is generally required to effectuate a detention within the boundaries of

the curtilage. *See United States v. Perea-Rey*, 680 F.3d 1179, 1186 (9th Cir. 2012) (warrantless

seizure within the curtilage violates the Fourth Amendment); *Ysasi v. Brown*, 3 F. Supp. 3d 1088,

1151 (D.N.M. 2014) (discussing *Perea-Rey* at length and concluding that because a back porch

is curtilage subject to the same protections as a house, officers needed either a warrant, probable

cause plus exigent circumstances, or consent to enter the back porch to speak with a domestic

violence suspect). By comparison, every single case the United States cites approving a

warrantless curtilage detention predates the Supreme Court's 2012 revival of Fourth Amendment

---

[15] In what appears to be an attempt to downplay the significance of *Jardines*, the United States emphasizes (1) that Justice Scalia was "writing for a divided Court" and (2) that Justice Kagan wrote a concurrence finding that the dog sniff search violated the defendant's reasonable expectations of privacy. USA Supplemental Brief at 6. The United States then argues that the "expectation of privacy that concerned the *Jardines* plurality is . . . not present here." *Id.* at 7. The Court is not sure what to make of this argument. There is no *Jardines* plurality, only a majority, a concurrence, and a dissent. By stating otherwise, the United States appears to be suggesting that Justice Scalia's majority opinion, which the United States clearly disfavors, is not controlling law. This is misleading and incorrect. The United States may not approve of Justice Scalia's "property rubric," but it is the law of the land.

property safeguards.[16] The Court could not find and the United States has not identified even one case interpreting *Jardines* in the manner indicated by the United States.

3.   *Payton* and *Santana*

Against this backdrop, the United States cites two Supreme Court cases – *Payton v. New York*, 445 U.S. 573 (1980) and *United States v. Santana*, 427 U.S. 38 (1976) – to support its claim that the curtilage of a home is a "public space" where police offers may conduct warrantless arrests. USA Supplemental Brief at 9. Notably, both of these cases predate *Oliver* and the subsequent case law recognizing and refining the protections afforded to the curtilage. They also predate *Jardines* and the renewal of Fourth Amendment property protections. Consequently, they do not provide the neat answers the United States desires. *Payton* is particularly unhelpful because it involved in-home arrests and did not require the Court to consider the legality of a detention in an area that has since been defined as constitutionally protected curtilage. In *Payton*, two criminal defendants challenged the constitutionality of a New York statute that allowed police to enter their homes to conduct routine felony arrests. *Payton*, 445 U.S. at 574. In both instances, the police physically intruded into the interior of the home. *Id.* at 576-78. The Supreme Court found the statutes and the corresponding intrusions unconstitutional and announced a blanket prohibition on warrantless in-home felony arrests. *Id.* at 589.

To the extent *Payton* sheds any light on the issue of warrantless detentions in the curtilage, it arguably supports Defendant's claims that such detentions are, like warrantless

---

[16] In *United States v. Jones*, 132 S. Ct. 945, 949 (2012), *Jardines'* intellectual precursor, the Supreme Court reiterated the "significance of property rights in search-and-seizure analysis." *Id.* at 949-50 ("[F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates. *Katz* did not repudiate that understanding.").

searches, per se unreasonable. The Supreme Court found support for the rule against warrantless

in-home arrests in prior case law drawing a distinction "between a warrantless seizure in an open

area and . . . seizure[s] on private premises . . . to which access is not otherwise available for the

seizing officer." *Id.* at 587 (internal citation omitted). Under this formulation of the law, it would

be more natural to group curtilage seizures (seizures on private property closely associated with

the home) with in-home seizures than with open area seizures.[17] Additionally, in *Payton*, the

Supreme Court rejected the legal division the United States advances between warrantless

searches and warrantless arrests. The *Payton* Court held that entries to arrest and entries to search

for and seize property "justify the same level of constitutional protection" because they implicate

the same interests "in preserving the privacy and the sanctity of the home." *Payton*, 445 U.S. at

588-89 ("any differences in the intrusiveness of entries to search and entries to arrest are merely

ones of degree rather than kind"). If this rule holds for the curtilage, which it might, there would

be no basis to allow warrantless detentions in the curtilage while outlawing warrantless searches.

To be sure, none of these hints or isolated statements are determinative of whether the warrant

requirement applies to curtilage detentions, and the Court does not cite them for this purpose.

What these statements show is that the Supreme Court in *Payton* was not irrevocably dividing

detentions into two unequivocal categories: in-home arrests governed by the warrant requirement

and public arrests, which need only be based on probable cause. *Payton* simply did not address

the problem of curtilage detentions and should not be read to withdraw Fourth Amendment

---

[17] The Supreme Court also found support for the rule against in-home warrantless arrests in the common
law tenet that a man's house is his castle. In a footnote, the Supreme Court cited authority for this
proposition, including the report for *Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K. B.
1603), which stated that the privilege to refuse entry to a sheriff "is confined to a man's dwelling-house,
or out-house adjoining thereto, for the sheriff on a *fieri facias* may break open the door of a barn standing
at a distance from the dwelling-house, without requesting the owner to open the door." *Payton*, 445 U.S.
at 597 n. 44. This authority included within the protections of the home an adjoining out-house,
suggesting that the rules protecting the home may extend to curtilage.

protection from such detentions when the curtilage was not yet a recognized feature of Fourth

Amendment law at the time *Payton* was decided.

The United States overstates the importance of the Supreme Court's phrasing of *Payton's*

holding:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth
> Amendment has drawn a firm line at the entrance to the house. Absent exigent
> circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton*, 445 U.S. at 590. For the reasons already discussed, the Court does not read this language

as expressing an opinion about the validity of a warrantless detention on a porch, in an enclosed

backyard, in a locked and adjoining out-house, or any other area that would now be deemed part

of the curtilage. This impulse is consistent with a reading of Supreme Court Fourth Amendment

jurisprudence as a whole. When highlighting the constitutional significance of the home, the

Supreme Court has often made sweeping statements about the sanctity of the home and about

Fourth Amendment protections beginning at the threshold of the home. These statements are not

confined to cases involving detentions. For example, in *Kyllo v. United States*, 533 U.S. 27

(2001), a case involving a technologically-assisted search of a home, the Supreme Court

reiterated that the Fourth Amendment draws a "firm" and "bright" line at the entrance to the

house. *Id.* at 40.[18] Read literally, like the United States reads identical statements in *Payton*,

*Kyllo* would constitute a rejection of *Oliver* and a repudiation of the curtilage doctrine. This, of

course, is a ridiculously strained reading of the law. The United States concedes that curtilage

searches are generally unreasonable in the absence of a warrant. The same reasoning applies

here. Although *Payton* said that the Fourth Amendment draws a firm line at the threshold, it is

---

[18] For another example of this phenomenon, *see United States v. Carter*, 360 F.3d 1235, 1241 (10th Cir. 2004) (stating that the "Fourth Amendment has drawn a firm line at the entrance to the house" while applying protections to the curtilage as part of the home).

28

clear that the Court was speaking emphatically about the protections due to the home, rather than issuing a decision about the lack of protections afforded to the curtilage.

*Santana* bears factual similarities to the present case and is, therefore, immediately more useful. In *Santana*, the Supreme Court held that the defendant, who was standing in her doorway, was located in a public place and could, therefore, be arrested without the added protections of a warrant. *Santana*, 427 U.S. at 42. Taken at face value, Santana certainly bolsters the United States' contentions about the purported legality of warrantless curtilage arrests. The problems with relying on *Santana* for this broad proposition, however, are twofold. First, because it precedes the emergence of the curtilage doctrine, *Santana* does not discuss what Fourth Amendment standards should generally govern curtilage detentions as opposed to front porch arrests. Second, *Santana's* underpinnings[19] have been eroded by *Jones* and *Jardines*. *Santana* explained that the defendant's threshold arrest was constitutional as follows:

> While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment [defendant] was in a "public" place. She was not in an area where she had any expectation of privacy. . . . She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house.

*Id.* at 72 (citing *Katz*, 389 U.S. at 351). The Supreme Court has since clarified that privacy is not the exclusive touchstone of the Fourth Amendment. *Jardines*, 133 S. Ct. at 1417. Under this law, placing an object within a publicly visible and accessible section of the curtilage does not mean law enforcement has free rein to search and seize this item without a warrant. *Id.* It is not obvious

---

[19] In *Santana*, the Supreme Court also addressed whether the defendant's retreat into her home kept officers from pursuing without obtaining a warrant. *Santana*, 427 U.S. at 42-43. Under what is now known as the "hot pursuit" exception to the warrant requirement, the Court held that the officers could follow defendant into her home without a warrant. *Id.* This part of *Santana*, which is immaterial to the present analysis, has not been drawn into question by subsequent case law. When the Court speaks of *Santana* and its validity, it is speaking solely of the portion of *Santana* regarding the constitutionality of front porch arrests.

that the protections afforded to a person standing within the curtilage would be less.[20] For these

reasons, the Court finds that *Santana's* statements about the public nature of front porch arrests

should be limited to the facts of the case. The Court will not read the case broadly as a statement

about the public nature of any arrest outside the four walls of the home. To the extent the United

States' broad reading of *Santana* (or of *Payton* for that matter) was plausible at one point in time,

it no longer tenable in light of *Jardines*.

### 4.   Policy Considerations

At the December 15, 2015 hearing, the United States attacked Defendant's opposition to

warrantless curtilage arrests on policy grounds. The United States cautioned against extending

the warrant requirement to the curtilage because such an extension supposedly would allow

criminals to break into houses with impunity. As the United States explained it:

> If somebody is standing outside your window, and it looks like they may be breaking in,
> until the police officers confirm if they have a property deed or not, defense counsel says
> they can't do anything. The government disagrees.

Transcript 94:7-11. The Court is not persuaded by this argument because there are several

recognized exceptions to the warrant requirement that allow officers to respond in a timely and

reasonable manner to emergency circumstances and ongoing crimes. *McInerney*, 791 F.3d at

1231. These exceptions strike a balance between privacy and security interests, which the Court

is loath to disturb.

---

[20] The tension between *Santana* and *Jardines* and the difficulty interpreting *Santana* in light of the
subsequent rise of the curtilage doctrine are both well-illustrated by *United States v. Larson*, 63 F. App'x
416, 424 (10th Cir. 2003). In *Larson*, the defendant argued that officers were required to have a warrant to
stand on the front porch of his building. The Tenth Circuit Court of Appeals rejected this argument on the
ground that the front porch did not constitute part of the building's curtilage. To support this conclusion,
the Court cited *Santana*. In other words, the Court read *Santana* not as a case about the protections due to
the curtilage but a case about the scope of the curtilage. This reading is plausible, but appears to
contradict the holding in *Jardines* that the front porch is a classic exemplar of curtilage.

5.   Conclusion

Simply put, the warrant requirement extends to the curtilage of a home. The question that remains is whether there is some exception to this general rule given the particular nature of the curtilage at issue in this case – an open front porch. In *Jardines*, the Supreme Court recognized one such exception for consensual "knock and talks." In their briefing, the United States suggests that there might be a second broader exception for investigations conducted on "publicly accessible curtilage." USA Supplemental Brief at 4. Finally, the existence of *Santana* hints at the possibility of an even narrower exception for front porch detentions. [21] The Court will address the applicability of each exception below.

### ii.   Exception 1: Implicit License

Courts have long acknowledged that the Fourth Amendment allows officers to approach a home, knock on the door, and attempt to speak with the residents without obtaining a warrant. *Kentucky v. King*, 179 L. Ed. 2d 865, 881 (2011); *United States v. Larson*, 63 F. App'x 416, 426 (10th Cir. 2003). This is commonly called a "knock and talk." In *Jardines*, the Supreme Court explained that such behavior is constitutional, even when it involves a physical intrusion onto the curtilage, because approaching a front door is implicitly licensed by the "habits of the country." *Jardines*, 133 S. Ct. at 1415. In other words, a "knock and talk" does not impinge on Fourth Amendment interests because it is deemed consensual. The Supreme Court explained the scope of the "knock and talk" exception as follows:

---

[21] This may not be an exhaustive list. For instance, the Ninth Circuit has suggested that an officer may enter the curtilage to arrest a suspect without a warrant if after investigation the officer reasonably believes the person to be a trespasser. *Struckman*, 603 F.3d at 747. At the hearing, the parties elicited some evidence suggesting that the officers thought Defendant was an interloper standing on someone else's porch. Hearing Transcript at 63:13-64:4, 64:24-65:19. However, neither party addresses the legal implications of this testimony in the briefing. Nor does the United States argue that the Officers' beliefs about Defendant's ownership of the porch furnish any basis for upholding the intrusion onto the porch. The Court will treat this argument as abandoned and will not address it in this MEMORANDUM OPINION AND ORDER.

> Th[e] implicit license typically permits the visitor to approach the home by the front path,
> knock promptly, wait briefly to be received, and then (absent invitation to linger longer)
> leave. Complying with the terms of that traditional invitation does not require fine-
> grained legal knowledge; it is generally managed without incident by the Nation's Girl
> Scouts and trick-or-treaters.

*Id.* Admittedly, this is not an exhaustive description of the license to approach a residence. But it contains a critical proscription, when police engage in a "knock and talk" they must comply with the same "background social norms" that govern the behavior of private visitors. *Id.* at 1415-16. The Supreme Court was very clear on this point: the invitation to knock on the front door is not an invitation to "do whatever [police] want by way of gathering evidence so long as they stay on the [path to the front door.]" *Id.* at 1416 n. 3. When entering the curtilage to conduct a "knock and talk," police may do "no more than any private citizen might do." *Id.* at 1415.

Here, the United States cites to "knock and talk" case law to support its argument that officers may tread on publicly accessible areas of private property. USA Supplemental Brief at 5. The United States does not, however, contend that the Officers had a knock and talk purpose or that their behavior was consistent with the invitation to approach that is extended to the public at large. To the extent the United States intends to make such an argument, it rings false. Officers Melvin and Demsich did not walk up to Defendant in a manner that was consistent with initiating a consensual conversation. They immediately drew firearms, issued orders, and used handcuffs, which was certainly "more than any private citizen might do." *Id.* at 1416. Accordingly, the "knock and talk" exception does not provide a shield for their behavior. *See Perea-Rey*, 680 F.3d at1189. ("knock and talk exception" to the warrant requirement does not "allow officers to meander around the curtilage and engage in warrantless detentions and seizures of residents"); *see also United States v. Carter*, 360 F.3d 1235, 1239 (10th Cir. 2004) (officers' decision to draw weapons and handcuff a defendant in his driveway "did not constitute a knock and talk").

When conducting a knock-and-talk, "officers [may] approach a home to contact the inhabitants[,] . . . [but] [t]he constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home." *Id.* at 1187-88. There was nothing consensual about the encounter in this case.

### iii.   Exception 2: Investigations in Publicly Accessible Areas

In its supplemental brief, the United States declares it well-settled that "police officers may go onto the publicly accessible curtilage of a private residence to investigate a crime." USA Supplemental Brief at 4. To support this position, it cites a variety of state law cases as well as *United States v. Titemore*, 437 F.3d 251 (2nd Cir. 2006), *United States v. Hatfield*, 333 F.3d 1189, 1194 (10th Cir. 2003),[22] and *Carter*, 360 F.3d at 1239 (10th Cir. 2004). These cases do state that officers may intrude on curtilage to conduct a search if "they restrict their movements to places visitors could be expected to go," *i.e.* places whose visibility and accessibility rule out any reasonable expectation of privacy. *Hatfield*, 333 F.3d at 1194-95. But, to the extent they stand for this proposition, they are no longer good law.[23] *Jardines* unequivocally rejected the position that officers could enter the curtilage to conduct a search as long as they stayed within the area open to the public or leading to the front door. *Jardines*, 133 S. Ct. at 1416 ("[T]he background social norms that invite a visitor to the front door do not invite him there to conduct a search.").

---

[22] In actuality, the United States quotes an excerpt from *Marcus v. McCollum*, 394 F.3d 813, 827-28 (10th Cir. 2004) (Brorby, J., dissenting) (citing *Hatfield*, 333 F.3d at1194). The United States, however, neglects to indicate that this portion of *McCollum* appears in the dissent. The persuasive value of the excerpt is, therefore, extremely limited and its only use lies in pointing the Court to *Hatfield*.

[23] The Court notes that the driveway search in *Hatfield* would likely be upheld under current doctrine on one of two grounds: (1) the driveway may not constitute curtilage, s*ee Reeves v. Churchich*, 484 F.3d 1244, 1254 (10th Cir. 2007) (front yard is not curtilage), and (2) even if it did, officers lawfully entered the driveway to conduct a knock and talk, so the observations made during this entry are constitutional. Similar reasoning would likely validate the intrusion onto the driveway in *Carter*.

The United States seeks to avoid this conclusion by misrepresenting the Supreme Court's discussion of the consensual "knock and talk" exception as a broad based permission slip allowing officers to "traverse the curtilage of a private residence . . . for investigatory purposes." USA Supplemental Brief at 7. The United States is walking a very fine line between advocating vigorously for its positions and overreaching. As already discussed, the Supreme Court explicitly rejected a reading of the "knock and talk" exception that would impliedly invite officers to enter the curtilage for the sole purpose of conducting a search. In accordance with this circumscribed formulation of the "knock and talk" exception, which limits both where officers may go and how they may behave, the Court has determined that the conduct of Officers Melvin and Demsich does not constitute a constitutionally permissible attempt to initiate a consensual conversation with Defendant. Thus, neither *Jardines* nor its progeny, *e.g.*, *United States v. Shuck*, 713 F.3d 563, 568 (10th Cir. 2013),[24] provide a basis for upholding the police intrusion onto Defendant's porch. There is simply no broadly recognized exception to the warrant requirement allowing officers to enter publicly accessible areas of the curtilage to conduct searches and seizures.[25]

---

[24] In *Shuck*, the Tenth Circuit Court of Appeals held that police acted lawfully when they enter the porch of a trailer home for a knock-and-talk and during this lawful approach smelled marijuana on a pipe located on the porch. Unlike *Shuck*, Officer Melvin and Demsich's entry onto Defendant's porch was not justified by or consistent with a "knock and talk" purpose.

[25] The Court notes that the United States relies heavily on Wayne R. LaFave, Search & Seizure (5th Ed.) to support its claims about the lack of protections afforded to the curtilage generally and publicly accessible areas of the curtilage specifically. The Court has not addressed the treatise in detail because there is plenty of case law to guide the Court's analysis. But it is worth nothing that this treatise does not unequivocally support the United States' position. In addition to the excerpts provided by the United States, the treatise elsewhere states: "[W]here the purpose of the police in entering the curtilage is to make an arrest thereon, there is considerable authority that such entry is prohibited by the Fourth Amendment to the same extent that it prohibits them from entering a home. This ordinarily means for police to enter the curtilage to arrest a suspect, police must have either a warrant, consent, or probable cause coupled with exigent circumstances." *Id.* § 6.1(b), n. 57 (internal citations omitted).

*iv.   Exception 3: Front Porch Detentions*

The reader might be forgiven at this point from wondering how the Court can entertain the possibility that there is an exception to the warrant requirement for front porch detentions. The Court has rejected the United States arguments that the warrant requirement (1) does not extend to curtilage arrests and (2) does not prevent the police from entering publicly accessible areas of the curtilage as they please. Stated positively, the Court has recognized that a warrant is generally required to justify a detention within the curtilage. In the normal course of affairs, this principle might compel a finding that Defendant's detention was unconstitutional. The state of the law, however, is not that clear. As the above discussion reveals, the case law suggesting that warrantless curtilage detentions are generally unreasonable must be balanced against countervailing case law suggesting that front porch arrests are nevertheless constitutionally acceptable, *Santana*, 427 U.S. at 72; *see also United States v. Flowers*, 336 F.3d 1222, 1224 (10th Cir. 2003) and *McKinnon v. Carr*, 103 F.3d 934, 935 (10th Cir. 1996) (officers may knock on a door and arrest occupants if they come out). Thus, the question of the legality of warrantless front porch detentions lingers and the Court finds itself faced with the same question with which it started: must police officers obtain a warrant to enter a suspect's front porch to effectuate an investigative detention or arrest, or is there some exception to the warrant requirement under these circumstances? Neither party has identified any case law addressing this question in light of the property law rubric employed in *Jardines*. Defendant's star cases – *Struckman*, *Perea-Ray*, and *Ysasi* – do not involve front porch arrests. Unfortunately, it appears the Court is in the unenviable position of reconciling two competing strains of Supreme Court precedent without Circuit Court guidance.

Having thought long and hard about how to approach this problem, the Court is convinced that the right result is to deny Defendant's motion to suppress and recognize a limited exception to the warrant requirement for front porch detentions. The Court believes this is the best reading of the case law for several reasons. First and most importantly, granting Defendant's motion to suppress would contradict the Supreme Court ruling in *Santana*. While the Court is sensitive to the erosion of *Santana's* underpinnings, *Santana* remains on-point, controlling authority that this Court is not free to ignore. When a Supreme Court decision "has direct application in a case," the district court must follow the decision questionable as it may be, "leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). In other words, even where a Supreme Court case – like *Santana* – "appears to rest on reasons rejected in some other line of decisions," lower courts should not assume it has been implicitly overruled. *Id.*; *see also Cressman v. Thompson*, 719 F.3d 1139, 1156 (10th Cir. 2013) ("Circuit courts should be very careful to suggest the Supreme Court has implicitly reversed itself."). Thus, the Court must take seriously *Santana's* decision to uphold a warrantless front porch arrest. The only way the Court sees to do so is to recognize a narrow exception to the warrant requirement for front porch detentions.

Even aside from *Santana*, the Court believes there are good reasons to allow warrantless front porch detentions as a practical corollary to the "knock and talk" exception. Under the "knock and talk" exception, officers are permitted to enter a suspect's porch to initiate a consensual encounter. Defendant concedes as much. However, he argues that officers should not be permitted to enter a porch to initiate a detention as part of an officer's investigation, of a recently committed, nearby crime, that might exonerate the person on the porch. The Court is concerned that this distinction is not workable. Imagine a case where (1) an officer approaches

36

an individual on a porch to ask if the individual knows anything about a nearby crime, (2) after the officer steps onto the porch, the officer sees that the individual is in possession of an item tying this individual to the crime, (3) because probable cause now exists and the officer is legally on the porch the officer forcibly arrests the suspect.[26] From the point of view of the officer, he complied with all Fourth Amendment requirements. However, from the point of view of the suspect, the officer stepped onto the porch and immediately arrested him. In a case like this, there is a very fine line between constitutional conduct – entering the porch for a chat and then responding appropriately to new information – and purportedly unconstitutional conduct – entering the porch to arrest the suspect.

Moreover, it is not clear that there is an important Fourth Amendment interest at stake in preventing officers from arresting suspects who are standing on their front porches. When a suspect places himself in such an area, he is opening himself up to being accosted by possibly unwelcome members of the public (for example, a zealous girl scout looking to push cookie sales or an insistent cult member wanting to convert his neighbors). Although an arrest is certainly more intrusive than a request to talk, this added intrusion is slight given law enforcement interest in having clear, workable Fourth Amendment standards. Additionally, Fourth Amendment reasonable suspicion and probable cause requirements already shield people from unreasonable detentions. It is not obvious to the Court that added protections are necessary to protect property owners from investigatory front porch detentions. This is significant, because the touchstone of the Fourth Amendment is always reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Defendant has not convinced the Court that the intrusion onto his front porch should be

---

[26] *Carter*, 360 F.3d 1235, provides an example of such a case. There, the officers entered the driveway (which Defendant argued was curtilage) to conduct a "knock and talk." When Defendant charged out, however, the officers responded with force. Thus, no consensual encounter, in fact, occurred. *Id.* at 1238.

considered unreasonable under the circumstances presented. The Court will deny Defendant's motion to suppress.

IT IS THEREFORE ORDERED that DEFENDANT BRADLEY SOZA'S MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT THEREOF (Doc. No. 34) is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE

38